

U.S. DISTRICT COURT
FILED AT WHEELING, WV

FEB - 2 2004

NORTHERN DISTRICT OF WV
OFFICE OF THE CLERK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DIANA MEY, individually and on behalf of a
class of all persons and entities similarly
situated,

        Plaintiff,

vs.

HERBALIFE INTERNATIONAL, INC.,
THOMAS STILES, PAMELA STILES,
NANCY WILLIS and DANA WILLIS,

        Defendants.

CIVIL ACTION NO. 5:03CV118

## MEMORANDUM OF HERBALIFE INTERNATIONAL, INC. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

27

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................ 1

ARGUMENT ................................................................................................... 2

I.    The TCPA Does Not Permit Class Actions .................................... 4

II.   Even If Class Actions Were Permitted Under The TCPA, No Class Should Be Certified In This Case ............................................................................ 7

     A.    Rule 23 Requires A Rigorous Analysis Of All Class Action Requirements; Failure to Meet Any Single Requirement Forecloses Class Certification ............ 7

     B.    Mey Has No Workable Plan To Readily Identify Class Members ....................... 9

          1.    CD Rom Discs And Databases, Even If Available, Do Not Readily Identify Class Members ....................................... 9

          2.    Telephone Records, Even If Available, Do Not Readily Identify Class Members ......................................... 12

     C.    Individual Issues Predominate Over Common Issues ....................... 17

          1.    The "No Prior Business Relationship" Requirement Presents An Individual Issue That, By Itself, Precludes Class Certification ........... 18

          2.    Whether Each Claimant Consented To, Or Gave Permission For, The Call Is An Individual Question That Defeats Predominance ........... 19

          3.    Whether Each Call Was To A "Residential Telephone Line" Is Also An Individual Question ....................................... 21

          4.    Whether The Call Was Received By The Putative Class Member Is An Individual Question Essential To Each Claim ....................... 21

     D.    A Class Action Would Not Be A Superior Method Of Litigating This Controversy ....................................................... 27

          1.    The Prospect Of Disproportionate Liability Defeats Superiority ........... 27

          2.    Individual Lawsuits Are A Practical Alternative ....................... 28

          3.    A Class Action Would Be Unmanageable ............................. 31

CONCLUSION ................................................................................................ 34

## INTRODUCTION

Defendant Herbalife International, Inc. ("Herbalife") opposes plaintiff Diana Mey's ("Mey") motion to certify a class to recover for alleged violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA").  Under the TCPA, Congress provided a specific and personal remedy, intending that individuals would pursue their own claims in small claims courts to recover statutory damages.  Congress set the statutory damage amount—$500 (or $1,500 for a willful violation)—at a level substantially higher than any actual damages in order to provide adequate incentive for aggrieved persons to file their own individual lawsuits. Congress never intended that a plaintiff would use the class action device to seek a remedy for untold numbers of absent individuals who have shown no interest in pursuing the TCPA's simple remedy on their own.  Congress also never intended that plaintiffs would use the class action device in conjunction with the TCPA's super-damage provision to impose an annihilating liability on defendants.  Congress simply never intended the TCPA to support a class action. This alone is fatal to Mey's request for class certification.

Moreover, even if the TCPA could support a class action in a proper case, it does not support one here.  This proposed class action is about allegedly prohibited prerecorded telephone solicitations.  But no court, to our knowledge, has certified such a plaintiff class.  Instead, the only TCPA cases in which some state courts have certified classes involve facsimiles ("faxes") containing unsolicited advertisements.[1]  By its nature, an offending fax leaves behind concrete

---

[1]     Although some state courts have certified classes in TCPA fax cases, other state courts and the two federal courts that have addressed the issue have denied certification in such cases.  See, e.g., Forman v. Data Transfer, Inc., 164 F.R.D. 400, 403 (E.D. Pa. 1995) (denying class certification because court would have to hold a mini-hearing on merits of each case); Kenro, Inc. v. Fax Daily, Inc., 962 F. Supp. 1162 (S.D. Ind. 1997) (same); Livingston v. U. S. Bank, N.A., 58 P.3d 1088, 1091 (Colo. App. 2002) (individual issues, such as whether each fax recipient gave prior express invitation or permission, predominated over common issues and thus precluded class certification); Kondos v. Lincoln Prop. Co., 110 S.W.3d 716 (Tex. Ct. App. 2003) (same); Levine v. 9 Net Ave., Inc., 2001 WL 34013297, at *2 (N.J. Super. A.D. June 7, 2001) (upholding denial of class certification in fax case because individual issues predominated).  See Ex 1, which lists all published and unpublished TCPA opinions of which we are aware that address a motion for class certification.

evidence of any TCPA violation as well as proof of who sent and received the fax. But a prerecorded call generally does not. A prerecorded call may not include a prohibited advertisement of goods or services. It may not even have been answered. If it was answered, it may have been answered by someone other than the listed subscriber to the telephone number to which the call was made.

Mey not only ignores the problems inherent in any proposed TCPA class action involving prerecorded telephone calls, she has failed to satisfy Rule 23's class certification requirements. Her failures can be grouped into three categories, any one of which is fatal. *First*, Mey has failed to establish how class members may be *readily* identified. *Second*, Mey cannot satisfy Rule 23(b)(3)'s predominance requirement, because the individual issues that must be resolved before Herbalife can be held liable to each of the millions of putative class members would swamp any classwide issues. *Third,* Mey cannot satisfy Rule 23(b)(3)'s superiority requirement, given the prospect of disproportionate liability and the insurmountable manageability problems in a TCPA class action compared to the practical alternative of individual lawsuits. Thus, even if the TCPA allowed a class action (which it does not), no class should be certified here.

## ARGUMENT

Mey's Memorandum in Support of her Motion for Class Certification ("Mey Mem.") is full of allegations related to the merits, such as that Herbalife actively promoted the use of autodialers by its independent distributors to convey prerecorded messages about Herbalife products or opportunities. Herbalife vigorously denies such allegations. Even the material appended to Mey's motion shows that Herbalife distributors are independent business people who are responsible for running their own businesses, subject to their commitment to Herbalife that they will:

> [C]omply with any and all local, state and federal ordinances, laws, or other regulations when advertising or promoting Herbalife products or business opportunity . . . [and assume] the responsibility . . . to determine what these may be and how they apply to their business.

Herbalife Code of Conduct, Rule 23-G (Ex. O to Mey Mem.).  Herbalife has specifically informed its distributors that they may *not* make prerecorded telephone calls:

> Prerecorded or Artificial Voice Messages.  Distributors may not deliver a prerecorded or artificial voice message to anyone unless, prior to the initiation of the call (a) the called party has expressly consented to the call, or (b) the caller and the residential subscriber for the telephone number being called have an existing and continuing business relationship formed by a voluntary two-way communication on the basis of an inquiry, application, purchase, or transaction.

Herbalife Rules Update: Telemarketing, p. 2 (Ex. R to Mey Mem.).  Herbalife has suspended distributors who failed to comply with laws respecting autodialers when such violations were brought to its attention.  See Affidavit of Richard Zelma ("Zelma Aff."), ¶ 9 & ex. 4 (Ex. J to Mey Mem.).

In responding to Mey's motion, Herbalife will not focus on the merits, but on whether a class should be certified.  Mey asks the Court to certify a class of "[a]ll residents of the United States of America"—or, alternatively, "[a]ll residents of West Virginia"—who have:

> . . . *no prior business relationship with the defendants*, to whom the defendants initiated, or caused to be initiated, *unsolicited* pre-recorded phone messages *promoting Herbalife goods or services*, on or after March 6, 1997.

Mey Mem. at 12.  (emphasis added).  As the italicized portions of Mey's own proposed class definition reflect, she recognizes that the TCPA does *not* prohibit the use of automatic telephone dialing systems or prerecorded messages under all circumstances.  Sifting the circumstances in which prerecorded calls are prohibited from those in which they are not requires the resolution of a number of factual issues that must be addressed on an individual basis.  For the reasons discussed below, Mey's request for class certification should be denied.[2]

---

[2] In addition to the defects discussed in sections I and II *infra*, Mey provides no valid basis for beginning the proposed class period on March 6, 1997.  Although she filed an individual lawsuit on March 6, 2001, Mey did not assert any class allegations, and did not name Herbalife or any of its distributors as defendants, until her amended complaint was filed on July 16, 2003.  July 16, 2003 is thus the first date on which any putative class member could take advantage of the class tolling doctrine recognized in Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 552-53 (1974).  Therefore, even assuming *arguendo* that the general federal four-year limitations statute applies, a class period could begin no earlier than July 16, 1999.  (Continued on next page.)

I.      **The TCPA Does Not Permit Class Actions.**

In at least three ways, the TCPA's legislative history and language show that Congress did not want TCPA claims aggregated into class actions. First, a plaintiff may not use the class action device if Congress expresses a contrary intent. See Califano v. Yamasaki, 442 U.S. 682, 700 (1979). The TCPA's legislative history shows that Congress clearly intended that TCPA claims be litigated in individual lawsuits, not in class actions.

In addressing the private right-of-action provision added to the TCPA very shortly before its passage, Senator Hollings, the bill's sponsor, stated:

> The substitute bill contains a private right-of-action provision that will make it easier for consumers to recover damages from receiving these computerized calls. The provision would allow consumers to bring an action in State court against any entity that violates the bill.   The bill does not, because of constitutional constraints, dictate to the States which court in each State shall be the proper venue for such an action, as this is a matter for State legislators to determine. Nevertheless, *it is my hope that States will make it as easy as possible for consumers to bring such actions, preferably in small claims court. . . . Small claims court or a similar court would allow the consumer to appear before the court without an attorney.*

Int'l Sci. & Tech. Inst., Inc. v. Inacom Communications, Inc., 106 F.3d 1146, 1152-53 (4th Cir. 1997) (quoting 137 Cong. Rec. S16205-06 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings) (emphasis added)). As the statute's sponsor, Senator Hollings' comments are "an 'authoritative guide to the statute's construction.' " United States v. Newport News Shipbldg. & Drydock Co., 837 F.2d 162, 167 (4th Cir. 1988) (quoting North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 527 (1982)); see NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760, 377 U.S. 58, 66 (1964) ("It is the sponsors that we look to when the meaning of the statutory words is in doubt.").

---

However, the general federal four-year limitations period, 28 U.S.C. § 1658, does not apply here. That time limit applies "[e]xcept as otherwise provided by law." The TCPA provides otherwise by making private lawsuits permissible only "if otherwise permitted by the laws or rules of court of a State." 47 U.S.C. § 227(b)(3). Thus, Congress directed that state law—not federal law—determine whether a TCPA claim is permissible, presumably including whether the claim is time-barred as well. If the court were to indulge Mey's desire to certify a nationwide class, the limitations period applicable to each individual claim would be an issue to be determined under the laws of 50 states rather than on a classwide basis. Cf. W. Va. Code, 55-2A-2 (1959) (limitation period applicable to a claim accruing outside of West Virginia "shall be either that prescribed by the law of the place where the claim accrued or by the law of this State, whichever bars the claim.")

Senator Hollings' remarks authoritatively show that Congress intended the TCPA to provide a specific and *personal* remedy to aggrieved recipients of unsolicited advertisements delivered via prerecorded telephone messages or facsimile transmissions. See Forman, 164 F.R.D. at 405.

Second, in crafting this specific and personal remedy, Congress provided for statutory damages that further underscore the impropriety of class treatment for TCPA claims. The TCPA provides for damages of $500, which can be trebled for willful or knowing violations. 47 U.S.C. § 227(b)(3). This amount is intended to—and surely does—substantially exceed the actual damages that could result when an individual receives an unsolicited telephone message or facsimile. See Forman, 164 F.R.D. at 404. Congress set the minimum damages this high specifically "to provide adequate incentive for an individual plaintiff to bring suit on his own behalf." Id. Thus, a TCPA plaintiff does not need a class action, the core policy of which "'is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'" Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 426 (4th Cir. 2003) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)).

Third, had Congress intended to allow class actions for TCPA violations, it would have capped the aggregate statutory damages allowed. The history of a similar federal consumer protection statute, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, et seq., illustrates the point. Not unlike the TCPA, the TILA originally provided statutory damages of not less than $100 for violations of its disclosure requirements in consumer credit transactions and did not limit aggregate damages in class actions. In Ratner v. Chem. Bank New York Trust Co., 54 F.R.D. 412, 413 (S.D.N.Y. 1972), the leading opinion on TILA class actions under the original statute, the Southern District of New York held that the TILA was not amenable to class treatment. Id. at 416; Mathews v. Book-of-the-Month Club, Inc., 62 F.R.D. 479, 479 (N.D. Cal. 1974) ("[Ratner] has come to be the leading case in class actions in Truth in Lending cases . . ."). Because of the relatively high statutory damages, the Ratner court concluded that "the incentive of class action benefits is unnecessary" and that "a class action is essentially inconsistent with the specific remedy supplied by Congress." 54 F.R.D. at 416. In addition, the court noted that,

if aggregated into a class action, the $100 recovery for each member of the class "would be a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant." Id. A majority of courts agreed with the reasoning in Ratner and refused to certify TILA classes. See, e.g., Watkins v. Simmons & Clark, Inc., 618 F.2d 398, 400 (6th Cir. 1980). In response, Congress amended the statute in 1974 to impose a cap on TILA class action recoveries. Id. The legislative history is clear that Congress imposed this cap specifically "to counter the manifest judicial unwillingness to impose class liability under the Act." Id. [3]

In 1991, when Congress enacted statutory damages for TCPA violations without capping aggregate damages, it knew the judicial history of the TILA and that the courts generally had refused to allow class actions under similar TILA provisions. See, e.g., Dresser Indus., Inc. v. United States, 238 F.3d 603, 614 n.9 (5th Cir. 2001) (recognizing that "a fundamental principle of statutory construction is 'that Congress is presumed to be aware of judicial interpretations of the law, and that when Congress enacts a new statute incorporating provisions similar to those in prior law, it is assumed to have acted with awareness of judicial interpretations of prior law'"); Bank One v. Guttau, 190 F.3d 844, 849 (8th Cir. 1999) (the courts presume "that Congress enacts legislation with knowledge of relevant judicial decisions"). In crafting provisions similar to those in the original TILA—rather than authorizing a class action and capping aggregate damages as it did in the amended TILA—Congress knew it was creating a private right of action

_____

[3]     In TILA cases, the maximum amount that can now be recovered in a class action is $500,000, or 1% of a defendant's net worth, whichever is less. See 15 U.S.C. § 1640(a). Such a cap arguably avoids the serious constitutional issues that would otherwise arise, e.g., under the due process clause of the Fifth Amendment and the excessive fines clause of the Eighth Amendment to the United States Constitution. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003). These constitutional limitations are an additional reason why the TCPA does not support a class action.

unsuitable for class treatment and clearly signaled its preference for individual actions over class actions to remedy the minor nuisance associated with TCPA violations.

The legislative history of the TCPA, its generous statutory damages for individual claims, and Congress' choice not to cap aggregate damages, show that Congress intended TCPA claims to be brought individually, preferably in small claims court, rather than as class actions. For this reason alone, Mey's motion for class certification should be denied.

## II. Even If Class Actions Were Permitted Under The TCPA, No Class Should Be Certified In This Case.

### A. Rule 23 Requires A Rigorous Analysis Of All Class Action Requirements; Failure To Meet Any Single Requirement Forecloses Class Certification.

Under Rule 23, "a class action 'may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites . . . have been satisfied.'" Health Plan, Inc. v. DeGarmo, No. 5:93CV7, 1996 WL 780508, at *4 (N.D.W.Va. Oct. 28, 1996) (quoting Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982)); accord, e.g., In re A.H. Robins, 880 F.2d 709, 728 (4th Cir. 1989), overruled on other grounds, Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997). Particularly when monetary damages are at stake, Rule 23 must be cautiously used to avoid unfairness. See Ortiz v. Fibreboard Corp., 527 U.S. 815, 844, 864 (1999); Gunnells, 348 F.3d at 468 (Niemeyer, J., concurring in part and dissenting in part).

Mey bears the burden of establishing that this case satisfies all of Rule 23's requirements. Lienhardt v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir. 2001). She must satisfy all of the well-known Rule 23(a) requirements of (1) numerosity, (2) commonality, (3) typicality and (4) adequacy of representation, Fed. R. Civ. P. 23(a), and at least one prong of Rule 23(b). Mey seeks to certify a class under Rule 23(b)(3), which requires her to show that:

> [Q]uestions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3) (emphasis added) ; Lienhardt, 255 F.3d at 147.

In addition to these explicit requirements, case law imposes two implicit requirements for class certification. Mey must show: (1) a precisely defined class exists; and, (2) as the proposed class representative, she is a member of, and has suffered the same alleged injury as, the proposed class. See DeGarmo, 1996 WL 780508, at *2 (citing E. Texas Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977), and Roman v. ESB, Inc., 550 F.2d 1343, 1348 (4th Cir. 1976)). "The prerequisites for certification are mandatory and failure to establish just one bars class certification." DeGarmo, 1996 WL 780508, at *4. When a plaintiff seeks to certify a class under Rule 23(b)(3), but cannot satisfy the predominance and superiority requirements, as is the case here, the court need not even address Rule 23(a). See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 339 (D.N.J. 1997).

Mey contends that Rule 23 should be construed "liberally" in favor of class certification and that " 'any doubts concerning maintenance of a class action should be resolved in favor of such action.' " Mey Mem. at 13 (quoting Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968)). If this ever was the law, it is no longer. Effective December 1, 2003, Rule 23(c)(1) was amended to scrap the concept of "conditional" class certifications and, with it, any lingering tolerance for the "if in doubt, certify" approach.[4]   The Committee Note states:

> The provision that a class certification "may be conditional" is deleted.  A court that is not satisfied that the requirements of Rule 23 have been met *should refuse certification until they have been met.*

Fed. R. Civ. P. 23(c), Advisory Committee's Note (emphasis added).  In short, when a "rigorous analysis" fails to convince the court that all of Rule 23's requirements have been met, no class should be certified.

---

[4]      The December 1, 2003 amendments apply to this case.  The Supreme Court's Order adopting these amendments provides that: "The foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2003, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." Supreme Court Order dated March 27, 2003, available at http://www.uscourts.gov/rules/congress0303/CV-Letters.pdf .

**B.     Mey Has No Workable Plan To Readily Identify Class Members.**

As this Court recognized in <u>DeGarmo</u>, the implicit requirement to show that a precisely defined class exists requires Mey to provide the Court with a workable plan for identifying class members. The Court must be given "enough information to determine the litigants whose claims will be adjudicated by the class action" and must be confident that it will be able to identify class members "with ease." 1996 WL 780508, at *3. In other words, the proposed class must be "readily ascertainable without a prolonged and individualized struggle." <u>In re Agric. Chems. Antitrust Litig.</u>, 1995 WL 787538, at *2 (N.D. Fla. Oct. 23, 1995).

Mey has failed to meet this basic requirement. In her amended complaint, she alleges that "[t]he class can be identified by phone records, CD Rom, disc or database, maintained by the defendants and/or their employees, representatives or agents." Complaint – Class Action, ¶ 71. But no specific description of any of these supposed sources of information is provided. Mey's motion and memorandum in support of class certification also lack these essential details. A perusal of both discloses only a glib assertion that "class members are easily identified by phone records," Plaintiff's Motion for Class Certification at 1, and a faint suggestion that such phone records might be available through "Herbatel", erroneously alleged to be an "Herbalife affiliate" (Mey Mem. at 6 & n.14). None of these assertions withstands scrutiny.

**1.     CD Rom Discs And Databases, Even If Available, Do Not Readily Identify Class Members.**

"CD Rom, disc or database" presumably refers to discs of information used in conjunction with so-called "autodialers" "to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers." 47 C.F.R. § 64.1200(f)(1). Before Mey can use such discs to identify members of her proposed nationwide (or even statewide) class, she must overcome at least four obstacles:

a.     <u>The discs are not in the possession, custody or control of defendants.</u>  Other than a few discs in the possession of defendant Stiles, and the discs alleged to be in the possession of Willis and Knapp, no party to this action has possession, custody or control of the discs that may have been used by unknown numbers of independent Herbalife distributors to make prerecorded

telephone calls.[5]   Mey has provided no plan for obtaining this information from these unidentified non-parties, or even for identifying who they are.  Nor has she revealed how long it would take her to conduct the massive, nationwide subpoena search necessary to gather such records, or confirmed that she is willing to bear its costs.  Cf. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178-79 (1974) ("[T]he plaintiff must pay for the cost of [class] notice as part of the ordinary burden of financing his own suit.").[6]

b.   Random and sequential autodialers may not contain any record of phone numbers that were actually called.   If distributors used autodialers that simply generated and dialed random or sequential phone numbers, Mey has not explained how any discs or databases used in that process would lead to the identification of class members.  Mey has not shown—and Herbalife does not know—whether any such automated dialing systems make a record of phone numbers that were actually called.  If not, it is unclear how discs or databases could be used to identify class members.

c.   Even when a disc constitutes an electronic database of actual, assigned phone numbers, the presence of a phone number on a disc does not establish that it was called.   The testimony of Pam Stiles shows that, even when an independent distributor uses an autodialer with an electronic database of actual, assigned telephone numbers, not all telephone numbers in

---

[5]   Herbalife has approximately 200,000 independent distributors in the United States.  How many actually may have used autodialers in their businesses to send prerecorded messages is unknown.

[6]   Plaintiff's discovery directed to countless unidentified Herbalife distributors could not stop at their discs or phone records.  In addition, plaintiff would also have to collect information from them as to the content of any prerecorded message they may have sent.  The recipient of such a message falls within Mey's class definition only if the message "promot[ed] Herbalife goods or services."  Mey Mem. at 12.  Obviously, proving the content of a message sent by, e.g., Mrs. Stiles, does not prove the existence or content of prerecorded messages sent by any of the non-party Herbalife distributors who may (or may not) have called putative class members.  Cf. Forman, 164 F.R.D. at 404 (TCPA claim was not suitable for class certification where there was "no common nucleus of operative facts present for the entire class").

the database are necessarily called. Stiles obtained five discs: one "Street Atlas" disc containing information for locating telephone numbers by zip code; and four "Phone Search USA" discs, each containing phone numbers in four different geographic regions. Pamela Stiles Dep., Vol. II, p. 166, ln. 15 – p. 170, ln. 18. (Ex. 2). She used the "Street Atlas" disc and one of the "Phone Search USA" discs, which contained phone numbers from 13 states (including West Virginia) and the District of Columbia. Id. However, not every phone number—not even every West Virginia phone number—on the "Phone Search USA" disc was a telephone number to which a prerecorded call was made. Stiles testified:

Q [By Mr. Byrum]. Now, how did you use Street Atlas, USA?

. . . .

A.      . . . Street Atlas, USA, along with the Phone Search, helps you to be able to program it, so that it will give you your numbers by zip codes.

Q.      I see.

A.      And then, it puts it into—I can program it into the machine, and it will do all the work.

. . . .

Q.      . . . So, was your—by using these then, was your computer programmed to dial calls in West Virginia?

A.      Yes, sir.

. . . .

Q.      Did you limit the calls to any particular part of West Virginia, or to all of West Virginia?

A.      *Usually, to local areas.*

        *Then, from there, I went long distance.*

Q.      . . . And by "long distance," did you—I noticed I seen some eastern panhandle stuff.

        Did you have any southern West Virginia or that area?

A.      Very few.

Q.      . . . Like Charleston area, let's say?

A.      No.

Q.      Parkersburg?

A.      No.

Q.      But eastern panhandle, you think?

A.      *We just went within like the calling plan that the phone system had.*

> *Like your phone book has a calling area. It's called like a regional directory, or whatever it says. We tried to stay within that area because of the long distance charges.*

Id., p. 167, ln. 24 – p. 170, ln.18 (emphasis added).

Stiles' testimony demonstrates that putative class members could not be accurately identified solely from telephone numbers included on a disc used with an autodialer because not all of the telephone numbers on the disc were used. Thus an attempt to identify class members just from analyzing computer discs would be wildly over-inclusive. The extent to which any other distributors may have "customized" similar data to work within their individual calling plans (as Stiles did) is simply unknown and unknowable without a "prolonged and individualized analytical struggle" to determine whether, and if so how, they used such discs.

    d.   <u>The presence of a phone number on a disc does not establish that a call to that number—even if it was dialed—was received.</u>  For the reasons stated in section II.C.4 below, a prerecorded message that is otherwise prohibited by the TCPA does not constitute a violation unless the message is actually received. Even if every phone number on an electronic database of such numbers is dialed, that does not mean that a prohibited message was received. <u>See</u> Pamela Stiles Dep., Vol. I, p. 31, ln. 21 – p. 32, ln. 8 (Ex. 3) (explaining that if an autodialed number did not answer, it was not automatically redialed).

Because Mey has failed to address these issues, she has not shown that CD Rom discs or databases would give this Court the information needed to readily identify putative class members. As shown below, telephone records are no panacea for these problems either.

    **2.**    **Telephone Records, Even If Available, Do Not Readily Identify Class Members.**

Mey vaguely asserts that class members may be identified by "phone records," but does not specify what phone records she has in mind. Presumably, she means a telephone record (such as a phone bill) that lists the telephone numbers that the billed subscriber (in this case, an Herbalife distributor using an autodialer) called. As simple as this sounds, phone records do not permit easy identification of class members because of the following problems, which Mey has failed to address.

a.   Most of the phone records are not in the possession, custody or control of defendants.   Other than any telephone records in the possession of defendants Stiles, Willis or Knapp, no party to this action has possession, custody or control of the phone records of the unknown independent Herbalife distributors that may (or may not) have made prerecorded calls to members of the nationwide class proposed by plaintiff.   Other Herbalife distributors are alleged to number in the "many thousands", Mey Mem. at 11, and those who have made prerecorded calls through autodialers are said to include distributors located in at least West Virginia, New Jersey, New Hampshire, Ohio, Illinois, Texas, California and Utah, id. at 7.   As was the case with CD Rom discs and databases, Mey has provided no plan for identifying and obtaining phone records from these non-party distributors.   Again, she has failed to inform the Court of the time and costs required to conduct the nationwide subpoena search that would be necessary to gather such records once the identities of any autodialing distributors are somehow determined.   And, again, Mey has not assured the Court that she is willing to bear the costs of conducting this massive undertaking, as Eisen requires.

Mey's alternative suggestion of a West Virginia class does not diminish this problem.   A West Virginia class would limit where putative class members lived, but not where the distributors who called them lived.   A West Virginia resident who received a prerecorded call from an Herbalife distributor would be a member of Mey's proposed West Virginia class regardless of whether the call originated in Ohio (where defendants Willis and Knapp reside), Oregon or Wisconsin.[7]   Of course, this means that, in order to identify putative class members, the search for distributors and their phone records would have to be as broad for the proposed West Virginia class as for the proposed nationwide class.

---

[7]   Although there may be an impetus to make such calls close to home, it cannot be assumed that that is always what is done.   For example, in a recent individual lawsuit filed by Stewart N. Abramson against Herbalife and others in Pennsylvania, Abramson, a Pennsylvania resident, claims that he received a prerecorded call in violation of the TCPA from Herbalife distributors in Wisconsin.   (Ex. 4, ¶¶ 4, 5, 6).

     b.   <u>Herbatel Records Cannot Solve These Problems.</u>  Mey claims that Herbalife offers phone service to its distributors through its "Herbatel affiliate"; that distributors make prerecorded calls over the "Herbatel network"; and that Herbalife has access to Herbatel phone records.  Mey Mem. at 6.  These unsupported assertions are inaccurate.

     *First*, Herbatel is not an affiliate of Herbalife; it is simply the name given to the long distance service provided to participating Herbalife distributors and customers by WorldCom.  Affidavit of William Lowe, at ¶ 2.  (Ex. 5).  *Second*, WorldCom does not provide Herbalife with the thousands (if not millions) of individual telephone numbers dialed by its distributors and customers.  <u>Id.</u> at ¶ 4.  *Third*, Herbatel is used by only 10% of current Herbalife distributors.  <u>Id.</u> at ¶ 2.  Stiles herself did not sign up for Herbatel service until January 2001, which, according to Mey, was *after* Stiles called her and 20,000 other putative class members in December 2000.  Pamela Stiles Dep., Vol. I., p. 53, ln. 11 – p. 54, ln. 20 (Ex. 3); Mey Mem. at 11.  *Fourth,* Herbatel is a long distance service only.  Lowe Affidavit, at ¶ 2.  Therefore, Herbatel phone records would not capture any local calls.  *Fifth*, WorldCom's records, which would have to be subpoenaed, would probably contain millions of telephone numbers called by participating distributors and customers over a period of years.  Any records that might be available through WorldCom would simply be part of—rather than a substitute for—the massive discovery that Mey would have to undertake to collect all necessary phone records for potential class member identification.  When WorldCom's records were combined with the records of AT&T, Sprint, MCI, and any other telephone companies used by the distributors, the parties would be swamped with voluminous records that would take months, if not years, to review and analyze, all at enormous, but unspecified cost, and without any assurance that the massive effort would accurately identify an appropriate class.

     c.   <u>Phone Records Likely Do Not Contain the Telephone Numbers to Which Any Local Prerecorded Calls Were Made.</u>  Telephone service providers commonly list long distance calls, but not local calls, on a subscriber's monthly bill.  The cost of local calls is typically included in a flat monthly service charge, rather than charged on a per-call basis.  Mey has not

shown that, contrary to this common practice, the phone bills that distributors received itemized their local calls.  Thus, the probability is high that, even through a massive nationwide subpoena search for the phone bills of Herbalife distributors who used autodialers, no records would be found from which one could identify class members who received prerecorded local calls.  The number of missed class members would hardly be insignificant.  As Stiles testified, she "usually" placed calls to local areas and "tried to stay within [her calling] area" to avoid long distance charges. Pamela Stiles Dep., Vol. II, p. 169, ln. 19 – p. 170, ln. 18 (Ex. 2).  Other distributors may well have followed the same approach.  In any event, Mey has not addressed the probability that local calls constitute a significant portion of the calls at issue.

To identify class members who received local calls, Mey would have to take discovery to the next level by issuing subpoenas not only to all autodialing distributors (once their identities are known), but also to the distributors' respective local telephone service providers to obtain their internal records identifying the distributors' local calls.  (The volume of these records and how long they are kept is unknown.)  What was already a "prolonged and individualized struggle" to identify class members would become even more difficult, time-consuming and costly.

d.   Further Problems Would Arise in the Effort to Convert Telephone Numbers into Identifiable Class Members.  Even if one could somehow overcome all of these obstacles to obtaining the phone numbers to which prerecorded calls were allegedly made, further problems arise in attempting to identify class members from those phone numbers.  Mey's own case illustrates these problems.  She received a prerecorded call from Stiles in December 2000 at telephone number (304) 232-0689 (the "0689 Number").  Diana Mey Dep., p. 14, lns. 8—12 (Ex. 6.)   The subscriber of record for that phone number was not Mrs. Mey, but her husband, Mark Mey.  Id., p. 47, lns. 2—14; Verizon phone bill addressed to Mark Mey (Ex. 7).  Thus, if one had performed a "reverse look-up" on the 0689 Number at the time the call was made, it is

Mark Mey—not Diana Mey—who would have been identified as a class member under plaintiff's suggested methodology for identifying class members.[8]

Now—three years later—it appears that neither Mr. nor Mrs. Mey would be identified as a class member. Last week, we used the "reverse look-up" feature on the website of the Mey's local phone company, Verizon, to determine who would be identified as the claimant at the 0689 Number and found that *no one* would. (Ex. 8.) This is probably because the Meys have moved to a different home with a different phone number. Such moves are not uncommon. Almost one-half of all U.S. residents move once every five years.[9]   For renters, the relocation rate is even higher; nearly one-third of people who rent their homes have moved in the previous year.[10] In short, identifying class members can hardly be described as something that could be done "with ease" in this case. To the contrary, the task would be mind-boggling, to say the least.

As a practical matter, these problems make it inappropriate to certify either a nationwide or statewide class as Mey proposes. See Klein v. Sec. Guards, Inc., 196 F.R.D. 261, 272 (E.D. Pa. 2000) ("We will not certify a class that will result in a laborious administrative process, where individual questions will overshadow common issues regarding Defendants' alleged conduct.")  Even with a narrower class covering only individuals called by defendants Stiles, Willis and Knapp—which still would not overcome all of the problems already identified—other defects addressed in sections II.C and II.D below still defeat certification. Herbalife will address these additional defects in the context of such a narrowed class, but they would expand exponentially if applied to the broader classes proposed by Mey.

---

[8]      If, as plaintiff suggests, the subscriber of record for the phone number allegedly called is the class member who is "readily identifiable" through a reverse look-up procedure, then her request for class certification would have to be rejected for the additional reason that Mrs. Mey is not a member of the proposed class she seeks to represent. See DeGarmo, 1996 WL 780508 at *2.

[9]      During the years 1995-2000, 120 million people, or 46% of the U.S. population, moved.  See Geographical Mobility: 1995 to 2000, U.S. Census Bureau, Sept. 2003  (Ex. 9).

[10]      See Hansen, Seasonality of Moves and Duration of Residence, U.S. Dept. of Commerce, Oct. 1998 (Ex. 10).

### C.      Individual Issues Predominate Over Common Issues.

A principal purpose of a class action is to conserve the court's and the litigants' resources by aggregating claims. See, e.g., Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 553 (1974). But a class action does not relax the substantive requirements and burden of proof applicable to individual claims, and does not alter any party's substantive rights or obligations.   To the contrary, the Rules Enabling Act mandates that, as a procedural rule, Rule 23 "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).

As the Fourth Circuit has recognized, this statutory mandate requires that courts "rigorously apply the requirements of Rule 23 to avoid the real risk . . . of a composite case being much stronger than any plaintiff's individual action would be." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 345 (4th Cir. 1998).  When the right to recover depends on a claimant's individual circumstances, a defendant's substantive rights would be abridged if the court were to permit the plaintiff to throw up a "fictional composite" of a class and did not accord the defendant "the benefit of deposing or cross-examining the disparate individuals behind the composite creation."  Id.  Echoing this view, the Fifth Circuit has recognized that: "Inescapably individual factors cannot be concealed in a throng."  McManus v. Fleetwood Enters., Inc., 320 F.3d 545, 549 (5th Cir. 2003); see also Malcolm v. Nat'l Gypsum Co., 995 F.2d 346, 350 (2d Cir. 1993) (" '[t]he systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's—and defendant's—cause not be lost in the shadow of a towering mass litigation.' ") (citation omitted).

Given that a class action does not—indeed, cannot—simply banish all individual issues from the case, the Rule 23(b)(3) predominance requirement is intended to measure the common issues against the individual ones.  If the time that is likely to be spent on individual issues is significant, then aggregating the claims will not produce the efficiencies that were intended and class treatment should be rejected. See Windham v. Am. Brands, Inc., 565 F.2d 59, 69 (4th Cir. 1977).

When threatened with annihilating liability, as Herbalife is here, a defendant is entitled (and highly motivated) to rely on every defense the law allows. The Rules Enabling Act preserves, and Herbalife is entitled to assert, every available defense against each and every putative class member, just as if each individually had sued Herbalife.[11] As shown below, the time that would have to be spent on individual issues—in order to protect Herbalife's rights under the Rules Enabling Act—would dwarf any savings that might be realized through aggregation.

        **1.**      **The "No Prior Business Relationship" Requirement Presents An Individual Issue That, By Itself, Precludes Class Certification.**

Consistent with a TCPA exemption, both of Mey's proposed class definitions require that class members have "no prior business relationship with the defendants."[12] Whether such a relationship existed when an allegedly prohibited call was made is a question that must be determined individually for each claimant. Even if the proposed class were narrowed to individuals called by the distributor defendants, this question still would have to be considered separately for each member of a class that is alleged to number at least 20,000 and possibly into the "hundreds of thousands." Mey Mem. at 11. On this ground alone, predominance is lacking and a class cannot be certified. See, Lienhart, 255 F.3d 138 at 149 ("If such an individualized inquiry is needed to determine the membership of a workable class, it is clear that common issues do not predominate over individual issues as required by Rule 23(b)(3)").

---

[11]     As discussed below, Herbalife has been sued, or threatened with suit, by individual claimants (including some of Mey's affiants) in various state courts and has elected *not* to assert its available defenses in such cases, but rather to quickly settle without regard to the merits, because of the relatively small amounts involved.

[12]     Congress empowered the Federal Communications Commission ("FCC") to create exemptions to the TCPA's ban on prerecorded calls to residential phone lines. 47 U.S.C. § 227(b)(2)(B). Pursuant to that authority, the FCC exempted telephone calls to "any person with whom the caller has an established business relationship at the time the call is made." 47 C.F.R. § 64.1200(c)(3)(as effective until Aug. 25, 2003); 47 C.F.R. §64.1200(a)(2)(iv) (effective Aug. 25, 2003); see 68 Fed. Reg. 44144.

Although Stiles testified that she did not know who she called and did not have an existing business relationship with them, see Pamela Stiles Dep., Vol. II, p. 188, lns. 2 – 10 (Ex. 2) that testimony does not avoid this individual issue. The question is not whether the caller was aware of a prior business relationship, but rather whether the person called actually had an existing business relationship with the caller or Herbalife. In Schneider v. Susquehanna Radio Corp., 581 S.E.2d 603 (Ga. Ct. App. 2003), the Georgia Court of Appeals affirmed judgment in favor of a radio station that had called Schneider with a prerecorded message about a Delta SkyMiles promotion. Although Schneider claimed that the call violated the TCPA, the court found that it did not because he had an established business relationship with the station by virtue of his prior enrollment in the station's "Freeloader Program," which provided enrollees with discounts at restaurants and entertainment events. Schneider argued that the established business relationship exemption did not apply because the telemarketing campaign in issue was not targeted at Freeloader members. The court rejected the argument, relying on the legislative history of the TCPA: "The determinative test is not the caller's intention in placing the call but 'the consumer's expectation of receiving the call.'" Id. at 606 (quoting H.R. Rep. 102-317, at 15, available at 1991 WL 245201).

Similarly, in this case, if any of the calls in issue was, in fact, made to a person with a prior business relationship with the caller or Herbalife, then that person does not have a valid TCPA claim and is not a member of the proposed class . Determination of this issue requires individualized inquiry as to each claimant and thus precludes a finding that common issues predominate.

> **2.     Whether Each Claimant Consented To, Or Gave Permission For, The Call Is An Individual Question That Defeats Predominance.**

A person does not have a TCPA claim based on a prerecorded call if he or she gave "prior express consent" to the call. 47 U.S.C. § 227(b)(1)(b). This limitation on statutory liability presents an individual question to be considered for each putative class member—tens of thousands, if not hundreds of thousands, of times. For this reason, the only federal courts that

have considered class certification motions under the TCPA have denied them. Although, for jurisdictional reasons, almost all TCPA cases are filed in state courts, our research has revealed two federal decisions considering class certification in the TCPA context on the merits: Forman v. Data Transfer, Inc., 164 F.R.D. 400 (E.D. Pa. 1995), and Kenro, Inc. v. Fax Daily, Inc., 962 F. Supp. 1162 (S.D. Ind. 1997).[13]  Both are fax cases.  In Forman, the court found that the Rule 23 requirements of commonality and predominance were missing because of the need to show that each recipient did not invite or give express permission to the sending of the fax:

> Plaintiff has mischaracterized the basis of liability as arising from defendant's mere *use* of the facsimile machine to send advertisements.  . . .  Under the language of the statute, however, liability arises only if a transmitted advertisement is *unsolicited*.  . . .  Thus, the essential question of fact that each potential plaintiff must prove is whether a specific transmission to its machine was without express invitation or permission on its part.

Forman, 164 F.R.D. at 404 .  Accord, Kenro, 962 F. Supp. at 1169-70 (denying class certification based on the reasoning in Forman).

The Forman reasoning applies directly to our case.  Just as the TCPA bans the sending of an "unsolicited advertisement" by facsimile, 47 U.S.C. § 227(b)(1)(C), it also bans a prerecorded message made for a commercial purpose—but only if that message includes "the transmission of any *unsolicited* advertisement," 47 C.F.R. § 64.1200(c)(2) (as effective until Aug. 25, 2003, see 68 FR 44144) (emphasis added).[14]

---

[13]     A third federal TCPA case, Joseph N. Main P.C. v. Elec. Data Sys. Corp., 168 F.R.D. 573 (N.D. Tex. 1996), also denied class certification, but did so on the ground that the motion was untimely under an applicable local rule.

[14]     Effective August 25, 2003, the FCC's regulation exempts prerecorded calls made for a commercial purpose if they contain neither an "unsolicited advertisement" nor a "telephone solicitation." 47 C.F.R. § 64.1200(a)(2)(iii).  Assuming *arguendo* that the revised regulation even applies in this case, this change makes no difference here.  By statute, both an "unsolicited advertisement" and a "telephone solicitation" are defined in such a way as to exclude information that is transmitted to a person with his or her "prior express invitation or permission."  47 U.S.C. §§ 227(a)(3) and (4).

### 3. Whether Each Call Was To A "Residential Telephone Line" Is Also An Individual Question.

Unlike the TCPA's broader ban on unsolicited facsimiles, the TCPA forbids unsolicited prerecorded phone calls to residential telephone lines only. 47 U.S.C. § 227(b)(1)(B). The purpose of the TCPA "is to protect residential telephone subscriber privacy rights by restricting certain commercial solicitation and advertising uses of the telephone and related telecommunications equipment." H.R. Rep No. 102-317, at 5, available at 1991 WL 245201; see also Int'l Sci. & Tech. Inst. Inc., 106 F.3d at 1150. But phone numbers are not permanently assigned. Thus, for every phone number included in any proposed list of disputed calls, individualized inquiry must be made into whether the number shown was assigned to a residence when the call was made, rather than to a business, a cell phone, or a pager.

### 4. Whether The Call Was Received By The Putative Class Member Is An Individual Question Essential To Each Claim.

For a call with a prerecorded message to have violated the statute, the message must have been "transmitted." 47 C.F.R. § 62.1200(c)(2); (as effective until Aug. 25, 2003, see 68 Fed. Reg. 44144).[15] For a person to have a TCPA claim, and be an eligible class member, he or she must be the person who received the transmission. These requirements raise individual questions that cannot be answered from a list of telephone numbers.

Although the TCPA does not define the term "transmitted," the common and ordinary meaning of the term "transmit" is "[t]o send or transfer *from one person or place to another.*" Black's Law Dictionary 1344 (5th ed. 1979) (emphasis added). Thus, the ordinary meaning of

---

[15] Prior to August 25, 2003, a prerecorded call made for a commercial purpose to a residence was not a TCPA violation unless it "included the transmission of [an] unsolicited advertisement." Id. As of that date, the FCC regulation was amended to prohibit prerecorded calls that "include or introduce" an unsolicited advertisement, see 47 C.F.R. §64.1200(2)(iii), as amended. Assuming *arguendo* that the revised regulation even applies in this case, it would not affect the need to show that each claimant actually received one of the prerecorded calls in issue. By statute, both an "unsolicited advertisement" and a "telephone solicitation" are defined in such a way as to encompass only certain information that is "transmitted" to a person. 47 U.S.C. §§ 227(a)(3) and (4).

the term "transmitted" confirms that, under the TCPA, a prerecorded message must actually have been *received* for liability to attach.

Courts that have considered the meaning of "transmit" or "transmission" in other federal statutes have reached the same conclusion. For example, in the leading case of <u>Robinson v. United States</u>, 849 F. Supp. 799, 802 (S.D. Ga. 1994), the court held that a "transmission" under the postal exception to the Federal Tort Claims Act "begin[s] when the postal matter [i]s accepted by the Postal Service and end[s] when it [i]s delivered." <u>See also</u> <u>Hunt v. United States</u>, 2002 WL 553736 at *3 (D. Kan. April 4, 2002) (agreeing with <u>Robinson</u> and citing dictionary definitions of "transmit" in support). Similarly, in <u>United States v. Fassoulis</u>, 185 F. Supp. 138, 139-40 (S.D.N.Y. 1960), construing the federal mail fraud statute, the court held that "'[t]ransmit' is not limited to the initial act which sends the message on the way, but embraces both the sending *and the receiving* of the message."

This receipt requirement is not only mandated by the TCPA's language, it is also confirmed by its legislative history. Senator Hollings, the Act's sponsor, explained that the TCPA's private right of action provision would allow those persons "*receiving* these computerized calls" to sue for $500 in small claims court. 137 Cong. Rec. S16204-05 (emphasis added). <u>See also</u> S. Rep. 102-178, at 8 (referring to the need to "protect unwilling *recipients*").[16]

There are a host of ways that a CD-ROM or telephone record might suggest or show that a call was made, yet fail to establish that the call was received, or received by the person listed as the subscriber to the telephone number that was called. For example:

---

[16]     Another reason that each claimant must prove that he or she personally received a call in violation of the TCPA is that, without such receipt, the claimant has suffered no injury in fact and, thus, has no standing. The Supreme Court has stated that the first element of "the irreducible constitutional minimum of standing" is that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical"'. . . ." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992) (citations omitted).

a.   <u>The Call Was Not Answered</u>.  The subscriber may have been away from home, and no voice mail or answering device recorded it.  Therefore, the telephone call was not "received" and, hence, the fact that a number is included on a CD-ROM, for example, does not give rise to a TCPA claim.[17]

b.   <u>The Call Was Technologically Intercepted</u>.  The call, though answered, may have been interrupted before the "transmission of any unsolicited advertisement."  47 C.F.R. § 64.1200(a)(2) & (c)(2).  Devices and services are available that automatically interrupt a call so that the subscriber can avoid listening to unwanted calls.  For example, Verizon's "call intercept" service picks up unidentified incoming calls before the subscriber's phone rings; requires the caller to record his or her identity; if the caller does not, a pre-recorded message is played stating that the subscriber does not accept unidentified calls, and the call is then disconnected.  <u>See,</u> "Verizon Call Intercept" at http://www22.verizon.com/ForYourHome/SAS/ (printed Dec. 20, 2003) (Ex. 11).  Without an individual inquiry, it would be impossible to know if a call appearing on a phone bill, for example, was intercepted by such a device or service before the message transmitting an unsolicited advertisement could be delivered.

c.   <u>The Call Was Manually Intercepted</u>.  The person answering the telephone, when confronted with the usual momentary silence before a recorded message begins, may have simply hung up.  Common experience tells us that this happens—and not infrequently.  When it does, there has been no call giving rise to a TCPA claim because no unsolicited advertisement was transmitted.[18]

---

[17]     If one conservatively assumes that the phone went unanswered in just 10 percent of the cases in which calls were attempted, a class including subscribers who did not answer those calls has the potential to inflate the aggregate statutory damage number—even for a class limited to persons allegedly called by the distributor defendants only—by at least $1 million (10% of 20,000 x $500) to as much as $30 million (10% of 200,000 x $1,500).

[18]     If one conservatively assumes that 20 percent of the attempted calls were interrupted (either technologically or manually) before the transmission of an unsolicited advertisement occurred, a class including these interrupted calls has the potential to inflate the aggregate statutory damage number—even

d.   <u>The Call May Have Been Answered By Someone Other Than the Subscriber</u>.  If someone other than the subscriber answered the phone, then a telephone record of the call will not identify a putative class member.  As we have seen, Mrs. Mey is not the subscriber in whose name the telephone number called was listed in Verizon's records.   Apparently, it is her contention that the proper claimant is not the subscriber at the time of the call, but the person who happened to pick it up.  In some cases, that may make sense, but if her contention is correct, it presents an individual fact question.  Who answered the phone?  Was it the subscriber?  His or her spouse?  The babysitter?  A roommate?  A neighbor, visiting family member, or other guest?  Such situations are certainly not uncommon.   Likewise, there has been no invasion of the subscriber's privacy if he or she was not even home and someone else happened to answer.  Individualized inquiry is necessary to determine who, if anyone, has a claim under the TCPA.

These are just a few examples of the many individual questions that would dominate protracted discovery proceedings and trial time if this case were to be tried as a class action. [19]

---

for a class limited to persons called by the distributor defendants only—by at least $2 million (20% of 20,000 x $500) to as much as $60 million (20% of 200,000 x $1,500).

[19]     The above list does not even consider possible variations in the law that may apply to claimants residing in different states.  Mrs. Stiles made prerecorded calls to Pennsylvania, as well as in West Virginia.  Pamela Stiles Dep., Vol. II, p. 169, lns. 10-12.  (Ex. 2).  It is currently unknown which states were called by the Ohio defendants, Willis and Knapp.  At this point, it is likely that the laws of at least three—and possibly many more—states would be involved if a class were limited to individuals called by the defendant distributors.  "No class action is proper unless all litigants are governed by the same legal rules."  <u>In re Bridgestone/Firestone, Inc.</u>, 288 F.3d 1012, 1015 (7th Cir. 2002).  Thus, a plaintiff must demonstrate that variations in the laws applicable to the claims of various class members will not defeat predominance.  <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d 734, 741 (5th Cir. 1996).  In this case, state law may govern a number of issues—such as whether Herbalife is vicariously liable for the actions of the independent-contractor distributors; the limitations period applicable to each class member's claim; and whether any award of aggregate damages would be excessive under state law.

It is Mey's burden to "creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'"  <u>Walsh v. Ford Motor Co.</u>, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (quoting <u>In re Asbestos Sch. Litig.</u>, 189 F.2d 996, 1010 (3d Cir. 1986)).  Mey ignores this burden.  She simply asserts, without any support, that "[t]he only legal and factual issues that exist in this case are common to the class."  Mey Mem. at 20.  Her assertion is insufficient to support class certification.  See <u>Andrews v. Am. Tel & Tel. Co.</u>, 95 F.3d 1014, 1024 (11th Cir. 1996); <u>Castano</u>, 84 F.3d at 742.

They are sufficient, however, to show that common issues do not predominate over individual ones. It is no answer to say that individualized questions relating to the existence of a prior business relationship, consent, message content, whether the call was made to a residence, and whether and by whom the call was actually received, should not preclude certification because the answers to some of these questions may be the same for some putative class members. The problem is the need to ask these individualized questions thousands, if not hundreds of thousands or even millions of times. See, e.g., Kondos, 110 S.W.3d at 721.

The courts have consistently held that, if the underlying facts require an individualized factual determination related to each class member's claim, then class certification under Rule 23(b)(3) is improper. As the Fourth Circuit emphasized in Gunnells:

> [R]egardless of other courts' interpretations of Rule 23, we have flatly held that "when the defendants' affirmative defenses … may depend on facts peculiar to each plaintiff's case, class certification is erroneous." Although it is difficult to determine with any precision, it appears that here the Agents' affirmative defenses are not without merit and would require individualized inquiry in at least some cases. Therefore, they may, indeed, "depend on facts peculiar to each plaintiff's case." Accordingly, class certification [wa]s erroneous.

348 F.3d at 438. See also Broussard, 155 F.3d at 340-44 (finding commonality and typicality lacking); Rodriguez v. Ford Motor Credit Co., 2002 WL 655679 (N. D. Ill. 2002) (holding that " 'where liability determinations are both individual and fact intensive, class certification under Rule 23 (b)(3) is improper' "); Arch v. Am. Tobacco Co., 175 F.R.D. 469, 490 (E.D. Pa. 1997) ("The facts and claims of this case implicate a number of affirmative defenses, all of which raise individual issues that preclude a Rule 23(b)(3) certification"); Hoyte v. Stauffer Chem. Co., 2002 WL 31892830, at *53 (Fla. Cir. Ct. Nov. 6, 2002) ("To obtain class certification, the plaintiffs must show that the defenses, as well as the elements of plaintiffs' causes of action, are not individualized"). [20]

---

[20]     Our research discloses that only one court has ruled on a motion to certify a class based on allegedly illegal telephone calls. In Biggerstaff v. Voice Power Telecomms., Inc., an unpublished opinion filed October 29, 2003, a South Carolina state court denied plaintiff's motion to certify because such a case "involves many factual determinations or issues that would impact whether any individual can meet

Significantly, many of the individual issues that defeat class certification in this case would not be likely to arise in an individual TCPA lawsuit filed in small claims court as Congress intended.   Individuals with a prior business relationship, or who had given prior consent or permission, are not likely to sue under the TCPA.   Individuals who did not personally answer the call, or who either technologically intercepted it or simply hung up before the transmission of any unsolicited advertisement, also would not sue because they would not even know who called.   The requirement for individual lawsuits itself filters out many non-meritorious claims.

On the other hand, as Mey envisions it, class treatment would force Herbalife to defend against a "fictional composite" of at least 20,000 to possibly "hundreds of thousands" or even "millions" of nameless telephone numbers, whose subscribers are all simply presumed to have had no prior business relationship with the caller or Herbalife; are presumed not to have given consent or permission for the call; are presumed to have answered their own phone; and are presumed to have actually listened to a 30 second prerecorded message.   According to Mey, this "fictional composite" is entitled to recover aggregate statutory damages of at least $10 million (20,000 x $500) and possibly more than $300 million (200,000 x $1,500).   This is exactly the type of "composite case" against which the Fourth Circuit warned in <u>Broussard</u>, 155 F.3d at 345. It is also the paradigm "composite case" that must be rejected under the Rules Enabling Act in order to protect Herbalife's due process right to challenge the claims of "the disparate individuals behind the composite creation."   <u>Id</u>.   The predominance requirement is not, and cannot be, met here.

---

the requirements of the statute to state a claim for recovery under the TCPA."   A copy of the court's opinion is attached as part of Ex. 1.

### D. A Class Action Would Not Be A Superior Method Of Litigating This Controversy.

A class action should be permitted only if class treatment will be superior to individual lawsuits. To assist the courts in the required "rigorous analysis" of superiority, Rule 23(b)(3) lists four non-exclusive factors that are pertinent:

(a) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(d) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3); see, e.g., Johnston v. HBO Film Mgmt., 265 F.3d 178, 185 (3d Cir. 2001); Windham, 565 F.2d at 65, n.7. As shown below, there are several reasons why a class action is not the superior means of adjudicating this controversy.

### 1. The Prospect Of Disproportionate Liability Defeats Superiority.

Even if the TCPA could be construed to permit a class action, a class would be decidedly *inferior* to individual lawsuits as a means to remedy any alleged TCPA violations. Even when proof of actual economic harm is not required for a plaintiff to recover under a statute, proof of actual harm may be required to show Rule 23(b)(3) superiority when "the defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff." See London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1255 n.5 (11th Cir. 2003) (collecting cases). A class action is not a superior method of resolving multiple individual claims when combining minimum statutory damages and a plaintiff class would result in "horrendous, possibly annihilating punishment" for a defendant, even though the actual harm, if any, is minimal. Ratner, 54 F.R.D. at 416; see also Forman, 164 F.R.D. at 405 (citing Ratner's "annihilating punishment" language to support the conclusion that "[a] class action would be inconsistent with the specific and personal remedy provided by Congress to address the minor nuisance of unsolicited facsimile advertisements").

Combining the TCPA's minimum statutory damages with Mey's desire to represent a plaintiff class creates just the kind of disproportionate liability that defeats superiority. The $500 minimum in statutory damages recoverable under the TCPA greatly exceeds any actual harm caused by the momentary and relatively minor nuisance of an unwanted telemarketing call. See Forman, 164 F.R.D. at 404. Mey asserts that "Herbalife is believed to have committed *millions* of violations of the TCPA." Mey Mem. at 22. Thus, Herbalife could be held liable for more than $500 million in damages, before the potential for a treble award is factored in. Even if a class was narrowed to those people called by the distributor defendants, the astronomical amount of statutory damages would dwarf the minimal nuisance, and any actual damages, that the prerecorded calls could have caused.

### 2. Individual Lawsuits Are A Practical Alternative.

Although Mey baldly asserts that individual lawsuits are not practical, individual lawsuits are, in fact, a practical and often used avenue for asserting TCPA claims. In 2002, a Columbia University Graduate School of Journalism article reported that "Robert Bulmash, author of the book 'So . . . You Want To Sue A Telemarketer', estimated that *at least 250 people across the country dedicate their free time to suing telemarketers*." David Scheer, Trying to Keep the Telemarketers at Bay, Columbia News Service, April 3, 2002, at http://www.jrn.columbia.edu/ studentwork/cns/2002-04-03/437.asp (printed Jan. 28, 2004) (Ex. 12) (emphasis added). According to the article, Bulmash said his book had sold 3,500 copies and "people have used it to collect more than $1.1 million since he began keeping track in 1996." The website of Bulmash's anti-telemarketing organization, Private Citizen, boasts that "we've helped our colleagues collect more than $2.2 million from telemarketers." http://www.private-citizen.com (printed Jan. 28, 2004) (Ex. 13). Obviously, individual TCPA lawsuits are not impractical for

those who want to prosecute their claims. Indeed, Bulmash recently made an individual claim against Herbalife and has since settled.[21]

Further, Mey's own evidence undercuts her claim that individual TCPA lawsuits are impractical. The exhibits to her memorandum are replete with examples of people who have themselves brought individual lawsuits (or have been sued individually) for alleged TCPA violations. Of the seven affidavits or statements that Mey submits (other than those of her lawyers), five are from the following individuals:

- Michelle Mikolos (Mey Mem. ex. D). Mikolos was sued under the TCPA by a New Hampshire consumer for telephone calls she made while an Herbalife distributor. Statement of Michelle Mikolos at ¶¶ 30-31.

- Joe Shields (Mey Mem. ex. I). As of 2002, Shields has sued for TCPA violations at least 36 times and obtained $80,000 in judgments. Scheer, supra.

- Richard Zelma (Mey Mem. ex. J). Zelma is listed on the Private Citizen website as a "Private Citizen Hero" for "dealing with telemarketers by taking them to court." PC Heros, available at http://www.stopjunkcalls.com/pc_hero.htm (printed Jan. 28, 2004) (Ex. 14). According to Private Citizen's website, Zelma "has received over $40,000 in judgments and settlements" against telemarketers. Id. Zelma recently brought his own individual lawsuit against Herbalife, which also has been settled. (See fn 21, which is also applicable to Zelma.)

---

[21]    Bulmash's Release of Herbalife is subject to a confidentiality provision. If ordered by the Court, Herbalife will file a copy of Bulmash's Release with the Court under seal.

- Jeffrey Mitchell (Mey Mem. ex. K). Mitchell has brought his own individual lawsuit against Herbalife in Utah state court. See Complaint, Mitchell v. Cloward, et al., Utah County (Utah) District Court No. C30404197 (Ex. 15).

- Donald R. Davis (Mey Mem. ex. N). Davis sued two Herbalife distributors in Texas state court for making prerecorded calls to his home. He has already obtained a judgment for $2000 in one of them. "Affidavit of Donald R. Davis" at Mey's Tab A.[22]

Mey knows full well that individual TCPA lawsuits are practical, having filed, or threatened to file, multiple TCPA lawsuits of her own. According to a recent Wall Street Journal article, Mey claims to have "reached as many as 20 settlements" with telemarketing companies over the past four years and "successfully taken five cases to court." Ryan J. Foley, "Telemarket Foe, Discover Card Head to Court." Wall Street Journal, Dec. 12, 2003, at B1. (Ex. 16).[23]  See also, Order, Mey v. Best Fin. Servs., Inc., No. 01C-1278 (Ohio County, W. Va. Mag. Court Nov. 2, 2001), available at http://www.dianamey.com/Jericho_jdgmt.html (printed Oct. 30, 2003) (Ex. 17); Order, Mey v. Feature Films for Families, No. 01C-233 (Ohio County, W. Va. Mag. Court Mar. 21, 2002), available at http://www.dianamey.com/fff.pdf (printed Oct. 30, 2003) (Ex. 18). Mey even operates her own Internet web site to trumpet her recoveries in her individual TCPA

---

[22]     Davis's success in his own lawsuit highlights yet another individual question; *i.e.* whether putative class members have already sued, obtained judgment and/or recovered for allegedly unlawful calls made by independent Herbalife distributors.

[23]     According to the Wall Street Journal, Mey recently sued Discover Card again. In January 2003, Mey's "family moved across town and switched phone numbers." Although Mey was on Discover Card's no-call list under her former address and telephone number, her new telephone number was previously in the name of a Discover Card customer. Discover Card set up the telephone numbers for a telemarketing campaign before Mey notified it of the change in her address and telephone number and, because its list was maintained by number (as is required by the FCC) rather than name, Discover Card mistakenly called Mey's residence, believing it was calling its customer. Mey then demanded $20,000 from Discover Card "for her trouble" and, after what the Wall Street Journal dubbed her "strong-arm tactic" failed, she used the TCPA as Congress intended—she filed an individual lawsuit. Foley, supra.

lawsuits and advise others how to do the same.    See "Diana's Info," at http://www.dianamey.com, where Mey states that "In fact, I have now collected nearly $100,000 total in fines or settlements from telemarketers, including my victory over Sears.  On only three occasions did I actually have to take a telemarketer to court.  Each time, I represented myself while the company hired some impressive looking attorney, and each time I won.  I have prevailed against Goliaths like Discover Card, Citibank, and Fleet Credit Card, to name a few." Ex. 19 (printed Jan. 29, 2004).  It is disingenuous for plaintiff herself to file, and encourage others to file, individual TCPA lawsuits when it suits her purposes, while simultaneously telling this Court they are impractical just because she wants to pursue a class action.

Nor is it significant that the courts have not been swamped with individual TCPA lawsuits against Herbalife or its independent distributors.  The lawsuits that do exist—and Mey's own experience—show that individual suits are a feasible means to obtain a remedy under the TCPA.  The fact that there are relatively few lawsuits compared to the "millions" of violations Mey claims exist may reveal nothing more than a lack of interest in pursuing a claim arising out of a momentary annoyance that resulted in no actual harm.  Or it may be that individuals are relying more on the FCC and state attorneys general to enforce the TCPA.  Of course, Mey may be wrong; there may have been few, if any, actual violations.  Whatever the reason, "'[i]f a class of interested litigants is not already in existence, the court should not go out of its way to create one without good reason.'"  In re Hotel Tel. Charges, 500 F.2d 86, 92 (9th Cir. 1974) (quoting Berley v. Dreyfus Co., 43 F.R.D. 397, 398 (S.D.N.Y. 1967)).

### 3. A Class Action Would Be Unmanageable.

A class action—even one limited to only those individuals called by the defendant distributors—would be unmanageable.  Mey's obligation to demonstrate manageability is a basic component of superiority.  As the Fourth Circuit has noted:

> [T]he issue of manageability of a proposed class action is always a matter of "justifiable and serious" concern for the trial court and peculiarly within its discretion. . . . And this is particularly true in actions governed by Rule 23(b)(3).

Windham, 565 F.2d at 65.  "The Supreme Court has described the manageability issue as

'encompass[ing] the whole range of practical problems that may render the class format inappropriate for a particular suit.'" Haley v. Medtronic, Inc., 169 F.R.D. 643, 653 (C.D. Cal. 1996) (quoting Eisen, 417 U.S. at 164). It is axiomatic that the greater the number of individual factual issues, the less manageable a class action becomes. In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214, 224 (E.D. La. 1998). As shown above, multiple individual issues would dominate this proposed class action and would probably take years to resolve.

Ignoring her burden to demonstrate manageability and the host of individual factual issues that this case presents, Mey offers only the facile and unsupported conclusion that "[m]anagement issues in regards to this class action will be minimal." Mey Mem. at 22. The Court should not indulge Mey's desire to "certify now and worry later." See McManus, 320 F.3d at 549 (quoting Southwestern Refining Co. v. Bernal, 22 S.W.3d 425, 435 (Tex. 2000) ("We reject this approach of certify now and worry later."). Instead, Mey's failure to provide anything that resembles a workable trial plan from which one could determine how she intends to conduct this proposed class action should weigh heavily against certifying a class. See In re Paxil Litig., 212 F.R.D. 539, 546-48 (C.D. Cal. 2003); see also Spence v. Glock, Ges.m.b.H., 227 F.3d 308, 313 (5th Cir. 2000) (upholding denial of class certification when the plaintiff failed to submit a workable trial plan addressing state law variations).

Finally, the Court should be wary of any suggestion that the serious manageability problems presented can be solved simply by a proof of claim process in which claimants would submit some form of proof, such as an affidavit or declaration, attesting to their receipt, perhaps years ago, of a prerecorded call transmitting an unsolicited advertisement from an Herbalife distributor. In In re Phenylpropanolomine (PPA) Prods. Liab. Litig., 214 F.R.D. 614 (W.D. Wash. 2003), the court rejected a similar suggestion in an analogous context. In that case, individuals would have qualified as members of the proposed class if they had purchased over-the-counter ("OTC") cough, cold and flu products containing PPA and remained in possession of some unexpired and unused portion of them on a specified date (November 6, 2000) occurring at least two years prior to the time that they would be asked to submit a proof of claim form. See

Id. at 615. Like the difficulties in distinguishing one prerecorded telemarketing call from another after the passage of time, the OTC medications at issue were not easily distinguishable from OTC medications not containing PPA. For example, at the relevant time, four Triaminic products contained PPA, while five Triaminic products with similar sounding names did not. Likewise, the makers of Contac, Dimetapp and Coricidin each made some products containing PPA and others that did not. Id. at 618. The court observed that, under the proposed proof of claim procedure, "[p]utative class members would be asked to distinguish, now over two years after the fact, between defendants' various products and the various formulations of those products, many of which differed only slightly in name and packaging." Id. The court rejected the plaintiffs' proof of claim proposal, stating:

> Plaintiffs posit that the only relevant question concerning their proposal would be whether or not adequate checks for fraud exist at the claims processing stage. However, the court finds itself equally, if not more, concerned about the vagaries of memory.

Id. at 617.

The PPA court also rejected the notion that "the use of sworn oaths or affidavits would avoid the individualized inquiry into class membership." Id. at 618. The court recognized that it would be "unrealistic to suppose that defendants will accept sworn oaths or affidavits under these circumstances. *Indeed, the court would not expect them to do so.*" Id. at 619 (emphasis added); accord, e.g., O'Connor v. Boeing N. Am., Inc., 197 F.R.D. 404, 415 (C.D. Cal. 1998) (using questionnaires at the claims stage inappropriate when defenses were not based on "easily verifiable 'objective' criteria"); Thompson v. Am. Tobacco Co., 189 F.R.D 544, 554 (D. Minn. 1999) ("In reality, even if a questionnaire could be used to establish prima facie evidence of injury, Defendants would be permitted to cross-examine each class members [sic] regarding that alleged injury.").

In this case, it is not likely that many people saved a recording of an allegedly offending call, even if they had one to begin with. Most claimants would have to try to remember the details of one of dozens of telemarketing calls they may have received over several years. Given

that these calls really are no more than nuisances—and many allegedly occurred months and years ago—"these details would sorely tax putative class members' memories." PPA, 214 F.R.D. at 618. This concern is especially acute here, because in Count III of her complaint, Mey alleges that the callers "failed to identify the source and purpose of the call." See plaintiff's Complaint—Class Action ¶ 89; also see ¶¶ 50, 62 and 92. If that is true, how would the recipients have known, let alone remembered, who called them months and years ago? Who could truthfully testify to the content of such a call? Plaintiff's request for class certification, at best, would require an impossible memory test and, at worst, is an invitation to fraud.

## CONCLUSION

Congress enacted the TCPA to provide a simple, inexpensive remedy for the momentary nuisance of unwanted telemarketing calls. The high statutory damages relative to the minimal actual harm is an incentive for individuals who believe they have been injured to pursue this simple, inexpensive remedy on their own. Some people, including Mrs. Mey, have pursued their individual remedy many times. Congress did not intend for a plaintiff to aggregate a multitude of alleged TCPA claims in a single lawsuit in order to impose annihilating liability on a defendant. Class treatment of TCPA claims is contrary to the purpose of the TCPA.

Moreover, Mey has not met her burden under Rule 23 to show that this kind of claim is appropriate for class treatment. Mey has not demonstrated that the putative members of her proposed class are readily identifiable, that common issues predominate, or that a class action would be superior to individual lawsuits. Mey's motion to certify a class should be denied.

...
...
...

RESPECTFULLY SUBMITTED this 30th day of January, 2004.

Louis A. Stahl
Arizona Bar No. 002835
Robert E. Miles
Arizona Bar No. 003822
Deana S. Peck
Arizona Bar No. 004243
QUARLES & BRADY STREICH LANG LLP
Two North Central Avenue
Phoenix, Arizona 85004-2391
(602) 229-5200

Lester C. Hess, Jr.
W. Va. Bar. No. 1695
BACHMANN, HESS, BACHMANN & GARDEN,
1226 Chapline Street
Wheeling, West Virginia 26003-0046
(304) 233-3511

John Preston Bailey
W. Va. Bar No. 209
BAILEY RILEY BUCH & HARMAN, L.C.
P.O. Box 631
Wheeling, West Virginia 26003-0081
(304) 232-6675

Attorneys for Defendant Herbalife International, Inc.

By _____
     Lester C. Hess, Jr.

<u>CERTIFICATE OF SERVICE</u>

Service of Herbalife's Memorandum in Opposition to Plaintiff's Motion for Class Certification was had upon the parties to this action by mailing a true copy thereof, postage prepaid, to them at their last known addresses, this 30th day of January, 2004, as follows:

By Federal Express, Next Day Overnight Delivery:

Edward A. Broderick
SHLANSKY & BRODERICK
1011 Beacon Street, Suite 2
Brookline, MA  02446

And

By First Class United States Mail:

Robert L. Hamer
Matthew P. McCue, Esq.
MIRICK, O'CONNELL, DEMALLIE & LOUGEE, LLP
100 Front Street
Worcester, MA  01608-1477
and
James A. Byrum , Jr.
SCHRADER, BYRD & COMPANION, PLLC
The Maxwell Centre
32 – 20th Street, Suite 500
Wheeling, WV 26003
(Counsel for Plaintiff)

Lawrence L. Manypenny
P.O. Box 638
New Cumberland, WV 26047
(Counsel for Defendants Thomas Stiles and Pamela Stiles)

Patrick S. Casey
Sharon Bidka Urbanek
FLAHERTY, SENSABAUGH & BONASSO, P.L.L.C.
1225 Market Street
P.O. Box 6545
Wheeling, WV 26003
and

Joseph W. Selep
ZIMMER KUNZ, P.L.L.C.
3300 U.S. Steel Tower, 600 Grant Street
Pittsburgh, Pennsylvania  15219
(Counsel for Defendants Nancy Willis and Dana Knapp)

_____

Counsel for Defendant Herbalife International, Inc.

**Index of Exhibits to Herbalife's Memorandum in Opposition to
Plaintiff's Motion for Class Certification**

Exhibit 1        TCPA Opinions Denying/Granting Class Certification

Exhibit 2        Deposition of Pamela Stiles, Vol. II (excerpts)

Exhibit 3        Deposition of Pamela Stiles, Vol. I (excerpts)

Exhibit 4        Plaintiff's Complaint in Abramson v. Herbalife Int'l of America, Inc., et al.,
                 (Dec. 2, 2003)

Exhibit 5        Affidavit of William Lowe

Exhibit 6        Deposition of Diana Mey (excerpts)

Exhibit 7        Verizon Bill Addressed to Mark Mey

Exhibit 8        Reverse Lookup Results For (304) 232-0689

Exhibit 9        Geographical Mobility: 1995 to 2000, U.S. Census Bureau (Sept. 2003)

Exhibit 10       Hansen, Seasonality of Moves and Duration of Residence, U.S. Dept. of
                 Commerce (Oct. 1998)

Exhibit 11       "Verizon Call Intercept" website, http://www22.verizon.com/
                 ForYourHome/SAS/ProdDesc.asp?ID=6063&state=P1, (printed Dec. 20, 2003)

Exhibit 12       David Scheer, Trying to Keep the Telemarketers at Bay, Columbia News Service,
                 April 3, 2002, at http://www.jrn.columbia.edu/ studentwork/cns/2002-04-
                 03/437.asp (printed Jan. 28, 2004)

Exhibit 13       Private Citizen website, http://www.private-citizen.com (printed Jan. 28, 2004)

Exhibit 14       "PC Heros," http://www.stopjunkcalls.com/pc_hero.htm (printed Jan. 28, 2004),
                 and http://www.stopjunkcalls.com/zelma,htm (printed Jan. 28, 2004)

Exhibit 15       Plaintiff's Complaint in Mitchell v. Cloward, et al. (Sept. 8, 2003)

Exhibit 16       Ryan J. Foley, "Telemarket Foe, Discover Card Head to Court." Wall Street
                 Journal, Dec. 12, 2003, at page B1

Exhibit 17       Court's Order in Mey v. Best Financial Services, Inc., No. 01C-1278 (Ohio
                 County, West Virginia Magistrate Court, Nov. 2, 2001), available at
                 http://www.dianamey.com/ Jericho_jdgmt.html (printed Oct. 30, 2003)

Exhibit 18       Court's Order in Mey v. Feature Films for Families, No. 01C-233 (Ohio County,
                 West Virginia Magistrate Court, Mar. 21, 2002), available at
                 http://www.dianamey.com/fff.pdf (printed Oct. 30, 2003)

Exhibit 19       "Diana's Info," at http://www.dianamey.com/Diana%27s_info.html,
                 (printed Jan. 29, 2004)